IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID CARL PHELPS, | ) | 8:14CV151 |
| | ) | |
| Petitioner, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| SCOTT FRAKES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

In 1991, Petitioner, David Carl Phelps, was convicted by a jury of kidnapping a 9-year-old girl, Jillian Dee Cutshall, who was last seen in Norfolk, Nebraska, on August 13, 1987. Phelps was sentenced to life imprisonment by the District Court of Madison County, Nebraska. His conviction and sentence were affirmed by the Nebraska Supreme Court, *see State v. Phelps*, 490 N.W.2d 676 (Neb. 1998) ("*Phelps I*"), and several subsequent motions for post-conviction relief have been denied. Phelps now seeks federal habeas relief under 28 U.S.C. § 2254 and claims actual innocence in order to overcome procedural default and untimeliness.

Central to Phelps' claim of actual innocence is newly discovered evidence, in the form of photocopied pages of a handwritten diary that allegedly were mailed to a man named John R. Oldson while he was standing trial for murder in 2013. Phelps alleges the diary was kept by a woman named Jean Backus, who wrote that she and her husband, Wetzel, along with Wetzel's brother, Chauncey, had kept girls shackled in a cave on their ranch near Chambers, Nebraska (located about 75 miles west of Norfolk), and performed sex acts on them. The author of the diary allegedly found one of the girls, "Jill Dee," while en route to Fremont, Nebraska (located about 75 miles southeast of Norfolk); the girl evidently was on foot and not wearing any clothes. According to the diary, the girl died while giving birth on June 2, 1989.

The diary indicates that Oldson's alleged victim, a young woman named Cathy Beard (identified as "Kathy" in the diary), who was reported missing on May 31, 1989, had voluntarily participated in the sex acts but was placed in shackles when she wanted to take Jill to the sheriff or a doctor. Beard allegedly died in September 1989 after Jean Backus ran her over with a pickup truck. The diary also describes the imprisonment and sexual abuse of two other girls, Sharon Bald Eagle and Karen Weeks, who went missing in 1984 and 1987, respectively.

After careful review, the court finds the newly discovered evidence is not reliable and would not likely cause any reasonable juror to have reasonable doubt as to his guilt. Because Phelps cannot establish his gateway claim of actual innocence, the amended petition for a writ of habeas corpus will be denied as procedurally barred with respect to his claims of ineffective assistance of counsel and as time-barred with respect to all claims. The action will be dismissed with prejudice, and a certificate of appealability will not be issued.

## I. BACKGROUND

This action was commenced on May 15, 2014, when Phelps filed a pro se petition in which he alleged, among other things:

> On aproximately [*sic*] May 1[,] 2012, I was made aware of a diary detailing the abduction, rape, and death of 9 year old Jillian Dee Cutshall, the child I am accused of kidnapping. I was unable to obtain a copy of the diary from the attorney for John Oldson, but filed a Post[-]conviction for an evidentiary hearing to find out if the diary is true, and vacate my sentence [*sic*] if it was shown true. The Judge denied my request for an attorney who could assist in this investigation.

(Filing No. 1 at CM/ECF p. 10). After reviewing the petition and some materials that were filed a later, including photocopied pages of the diary with transcription, the court appointed the Federal Public Defender to represent Phelps and directed that an amended petition be filed (Filing No. 7).

An amended petition was filed on March 27, 2015, in which Phelps alleged that his gateway claim of actual innocence is supported by at least the following evidence:

1. On August 13, 1987, nine-year-old Jill Cutshall of Norfolk, Nebraska, disappeared. Her body has never been found and no forensic evidence has linked Phelps to the crime.

2. One of the key pieces of evidence admitted against David Phelps at trial was a "confession" videotaped by KMTV news reporters. The taping was arranged by Roy Stephens, a private investigator who had become involved in the case at the request of Jill Cutshall's mother, Joyce. Stephens, a convicted felon, was a self-trained investigator working for a firm operating under the name "Interstate Bureau of Investigation."

3. The events leading up to the taped interview are largely undisputed and are important both to Phelps' actual innocence claim and to his substantive constitutional claims. On January 4, 1989, Stephens arranged for television reporters with whom he had become acquainted to come to Norfolk, promising them a front seat to a break in the Jill Cutshall investigation. With the reporters waiting in Stephens' hotel room, Stephens and his assistant lured Phelps to the Wood Duck wildlife preserve [located about 15 miles southeast of Norfolk], gave him a shovel, ordered him to show them where Cutshall was buried, followed him with a gun for more than an hour, and threatened to kill him and his family. After at least 90 minutes of marching Phelps around the preserve, with Phelps repeatedly asserting that he had no idea where Cutshall was, Stephens fired his gun into the air from behind Phelps. A startled Phelps stopped walking. In response to the shot, Phelps stated that his friend Sam Arbogast had told him that Cutshall was buried in the cemetery section of the preserve.

4. Phelps and the two private investigators drove to the Wood Duck Cemetery, where Stephens again demanded that Phelps show them where Cutshall was buried. After walking to an area under some trees where Phelps said he had heard Cutshall was buried, Phelps began digging into the frozen ground. Twenty minutes or so later, with Phelps visibly fatigued, Phelps told Stephens he was ready to talk about

-3-

Cutshall. Phelps then claimed that his friend, Kermit Baumgartner, had woken him on August 13, 1987, after a night of drinking. Baumgartner told Phelps that he had Jill Cutshall out in his car and that they were going for a ride. Phelps joined Baumgartner and Cutshall, having no idea of the circumstances under which Cutshall had encountered Baumgartner. Baumgartner drove Phelps and Cutshall to the Wood Duck area. Phelps realized the nature of Baumgartner's plan when Baumgartner began to sexually assault Cutshall. Phelps initially held on to Cutshall while Baumgartner assaulted her, and Phelps himself became aroused. However, Phelps said that he then became nervous and told Baumgartner that they should leave. Baumgartner told Phelps to take the car and go by himself, so Phelps drove off. According to Phelps, Cutshall was alive and with Baumgartner the last time he saw her.

5. After Mr. Phelps finished this story, Stephens and his assistant walked Phelps back to the van. They then drove Phelps back to Stephens' room at the Econolodge, where the news reporters were waiting. With Stephens and his assistant in the room, the reporters recorded Phelps relating the same story. At the conclusion of the interview, Stephens contacted Joyce Cutshall and asked them to bring the police to the Econolodge. The police came and arrested Phelps.

6. At the police station, Mr. Phelps was ushered into an interview room by Norfolk Police Detective Steve Hecker, one of the lead officers assigned to Cutshall's case. Mr. Phelps told Detective Hecker that he had fabricated the entire story out of fear for his life. Nonetheless, the videotaped "confession" was admitted into evidence at trial over Phelps' objection. That "confession" was the centerpiece of the prosecution's case against Phelps.

7. Against this backdrop, new evidence has come to light which will establish, as Phelps has long asserted, that he is actually innocent of this crime. The new evidence is evidence that other persons abducted Jill Cutshall. Evidence that others perpetrated the crime is contained, first, in the above-mentioned diary. The diary came to light during the prosecution of John Oldson for the murder of Cathy Beard. The diary is alleged to have been written by a woman named Jean Backus between the years 1984 and 1989. It recounts in graphic detail the imprisonment,

-4-

rape, and eventual deaths of 3 girls on the Backus ranch near Chambers. One of the women in the diary is identified as Jill Cutshall, and another Oldson's alleged victim, Cathy Beard.

8. The second admission is a jailhouse confession made to a prisoner at the Lincoln Correctional Center. The prisoner wrote to attorneys at the Iowa/Nebraska Innocence Project that his cellmate had bragged about the Cutshall abduction and how he had gotten away with it. The prisoner asked to be able to speak with representatives from the Innocence Project in person, but that meeting apparently did not take place.

(Filing No. 14 at CM/ECF pp. 3-6). Phelps further alleged that the newly discovered evidence "entitles him to full discovery and an evidentiary hearing" (Filing No. 14 at CM/ECF p. 6, ¶ 9).

Ten constitutional claims are alleged in the amended petition, including: (1) a claim regarding the admission of the videotaped statement, (2) a claim regarding the denial of motion for a change of venue, (3) a claim regarding the overruling of a challenge to the jury array, (4) a claim regarding an alleged lack of proof that venue in Madison County was proper, and (5-10) six claims of ineffective assistance of counsel. It is claimed Phelps' trial attorney erred by failing to impeach two witnesses, by failing to investigate alternative suspects, by failing to hire an expert on coerced confessions, by calling a mentally disabled alibi witness to testify, by advising Phelps not to testify, and by making derogatory remarks about Phelps during the trial.

Upon initial review of the amended petition, the court determined that the case should be progressed and, because Phelps indicated his actual innocence claim would require discovery and an evidentiary hearing, requested input from counsel (Filing No. 16). Thereafter, on June 3, 2015, the court approved a jointly proposed schedule which called for Respondent to file applicable state court records, an answer, and a brief, for Phelps to file a responsive brief, and for Respondent to file a reply; no discovery was permitted (Filing No. 18).

The state court records were filed on June 30, 2015 (Filing No. 19). An answer was filed on July 31, 2015, in which Respondent generally denied Phelps' allegations and asserted as affirmative defenses that "Petitioner's habeas petition was not timely filed and is barred by the limitations period set forth in 28 U.S.C. § 2244(d)" and "Petitioner's Amended Petition alleges claims that are procedurally defaulted" (Filing No. 20 at CM/ECF p. 3, ¶¶ 14-15). In a brief filed on August 14, 2015, Respondent clarified that while he was asserting the statute of limitations defense with respect to all ten habeas claims, he was only asserting procedural default with respect to Phelps' six claims of ineffective assistance of counsel (Filing No. 23 at CM/ECF pp. 9-10). He indicated that Phelps other claims were rejected by the Nebraska Supreme Court on direct appeal (Filing No. 23 at CM/ECF p. 10).

On September 14, 2015, Respondent filed portions of the Nebraska Supreme record in *State v. John R. Oldson*, Case No. 13-562, on appeal from the second degree murder conviction of Oldson in the District Court of Howard County, Nebraska (Filing No. 25). This filing pertains to the alleged Backus diary and includes: (1) two orders entered by the Howard County District Court, sustaining the State's objections to the diary and denying a motion for new trial based on newly discovered evidence relating to the diary (Filing No. 25-1); (2) an index of all transcribed proceedings (*i.e.*, the "Bill of Exceptions") in the District Court (Filing No. 25-2); (3) a transcript of the hearing on the State's objections to the diary, held on February 4, 2013 (Bill of Exceptions, pp. 916-960) (Filing No. 25-3); (4) a transcript of Oldson's offer of proof regarding the diary, made on February 6, 2013 (Bill of Exceptions, pp. 1430-36) (Filing No. 25-4); (5) a transcript of the hearing on Oldson's motion for new trial, held on May 6, 2013 (Bill of Exception, pp. 1789-1840) (Filing No. 25-5); (6) copies of trial exhibits (Ex 227-250) offered at the hearing on the State's objections and as part of Oldson's offer of proof (Filing No. 25-6); (7) the deposition of Jean Backus (Ex 252) taken on January 16, 2013 (Filing No. 25-7); (8) a copy of the diary pages with transcription (Ex 286) (Filing No. 25-7 at CM/ECF pp. 1-55); (9) a Nebraska State Patrol laboratory report on DNA analysis of the mailing envelope for the diary pages

(Ex 296), indicating a match with Douglas D. Olson (Filing No. 25-8 at CM/ECF pp. 56-57); and (10) highlighted diary pages (Ex 253) (Filing Nos. 25-9, 25-10).

On November 12, 2015, Phelps filed a motion for an evidentiary hearing on the claim of actual innocence claim (Filing No. 29). The court ordered briefing on this motion and directed Phelps to "[s]pecify why an evidentiary hearing is necessary" and to "[d]escribe in detail what evidence he intends to offer at such hearing" (Filing No. 31). On January 27, 2016, Phelps withdrew his request for an evidentiary hearing and asked for additional time to respond to Respondent's initial brief (Filing No. 32), which the court granted (Filing No. 33).

Phelps' brief was filed on March 24, 2016 (Filing No. 35). The brief only discusses the alleged Backus diary—no mention is made of the other alleged new evidence involving a jailhouse confession by an inmate at the Lincoln Correctional Center. Phelps is therefore deemed to have abandoned his claim that someone else has confessed to kidnapping Jill Cutshall. *See* NECivR 7.1(a)(1)(A) ("A party's failure to brief an issue raised in a motion may be considered a waiver of that issue.").

Respondent replied on August 5, 2016 (Filing No. 43) and filed additional evidence (Filing No. 42). The additional evidence includes: (1) a copy of the Nebraska Supreme Court opinion issued on June 10, 2016, affirming Oldson's conviction for second degree murder and sentence of life imprisonment (Filing No. 42-1); (2) court records for the case of *State v. Douglas D. Olson*, No. CR13-76, filed in the County Court of Valley County, Nebraska, and charging Olson with tampering with evidence (Filing No. 42-2); (3) copies of investigation reports regarding Olson (Filing No. 42-3); (4) the deposition of Johnny Lee Ervin, IV, taken on June 17, 2014, in connection Olson's criminal case (Filing No. 42-4); and (5) the declaration of Respondent's counsel (Filing No. 42-5) authenticating items (2)-(4) above and stating they were sent to Phelps' attorney on October 27, 2015.

## II. ANALYSIS

The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a one-year limitations period for state prisoners to file federal habeas relief that runs from the latest of four specified dates. *See* 28 U.S.C. § 2244(d)(1). Phelps' habeas petition was unquestionably filed out of time.

Phelps' direct appeal from his conviction and sentence concluded on December 2, 1992, when the Nebraska Supreme Court issued its mandate (Filing No. 19-1 at CM/ECF p. 3). Phelps' next state court filing was over twelve years later, on July 20, 2005, when he sought DNA testing on certain physical evidence, including Jill Cutshall's clothing, which had been discovered at a wildlife management area near Stanton, Nebraska, on November 7, 1987 (Filing No. 19-3 at CM/ECF p. 15). The Madison County District Court's denial of DNA testing was affirmed by the Nebraska Supreme Court, *see State v. Phelps*, 727 N.W.2d 224 (Neb. 2007) ("*Phelps II*"), and its mandate issued on February 14, 2007 (Filing No. 19-1 at CM/ECF p. 6).

Another two years passed before Phelps filed his first motion for post-conviction relief, on September 29, 2009 (Filing No. 19-26 at CM/ECF pp. 1-22). The motion was denied by the Madison County District Court on April 15, 2010, and Phelps did not appeal (Filing No. 19-26 at CM/ECF pp. 28-31; Filing No. 14 at CM/ECF p. 2, ¶5). A second motion for post-conviction relief was filed on February 11, 2011, and denied on May 3, 2011 (Filing No. 19-26 at CM/ECF pp. 32-37, 40-43). Again, no appeal was taken (Filing No. 14 at CM/ECF p. 2, ¶6). Phelps' third, and most recent, motion for post-conviction relief was filed on August 9, 2012, and denied by the Madison County District Court on October 3, 2012 (Filing No. 19-4 at CM/ECF pp. 83-84, 90-92). The Nebraska Supreme Court affirmed the denial, *see State v. Phelps*, 834 N.W.2d 786 (Neb. 2013) ("*Phelps III*"), and issued its mandate on July 2, 2013 (Filing No. 19-1 at CM/ECF p. 9).

-8-

The present action was filed on May 5, 2014 (Filing No. 1). While this filing was made within one year following the conclusion of the third post-conviction proceeding, the limitations period began running on "the date on which the judgment became final by the conclusion of direct review," 28 U.S.C. § 2244(d)(1)(A), which was December 2, 1992. The running of the statute of limitations is tolled while a properly filed application for state post-conviction or other collateral review is pending, *see* 28 U.S.C. § 2244(d)(2), but Phelps waited many years after his direct appeal before seeking any post-conviction relief. Because the limitations period had already expired, the filing of post-conviction motions in state court did extend the time for filing a federal habeas petition. *See Jackson v. Ault*, 452 F.3d 734, 735 (8th Cir. 2006) ("The one year AEDPA limit for federal habeas filing cannot be tolled after it has expired.").

AEDPA also provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State ...." 28 U.S.C. § 2254(b)(1)(A). The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts ... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme

Court if the Court of Appeals rules against the petitioner.[1] *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005). "In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted).

When "no state court remedy is available for the unexhausted claim"—that is, if resort to the state courts would be futile—"then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)). Stated another way, if a claim has not been presented to Nebraska's appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *Akins*, 410 F.3d at 456 n. 1.

Respondent concedes that the first four constitutional claims alleged in the amended petition are exhausted, stating that "[t]he Nebraska Supreme Court rejected Phelps' claims one through four on direct appeal in *Phelps I* by an extensive and thorough analysis supported by the trial court record" (Filing No. 23 at CM/ECF p. 10). Respondent further states that Phelps "arguably raised his ineffective assistance of counsel claims in his first state postconviction proceeding," but points out that he "did not appeal from the denial of postconviction relief" (Filing No. 23 at CM/ECF p. 9). Because claims five through ten of the amended petition did not undergo "one complete round" of appellate review in the state courts, they are procedurally barred.

---

[1] Phelps' three appeals were all heard on direct review by the Nebraska Supreme Court.

A claim that has been procedurally defaulted in the state courts will not be entertained in a federal habeas corpus proceeding unless the petitioner has shown "cause and prejudice" to excuse the procedural default, or, in the alternative, has shown there would be a "fundamental miscarriage of justice" if the federal court declined to consider the claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "fundamental miscarriage of justice" exception is available only upon a "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). "To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Schlup*, 513 U.S. at 324.

The "actual innocence" gateway through a procedural bar is "an opportunity for a petitioner, aggrieved by an allegedly defective trial and having inexcusably defaulted the available remedies, to raise such a strong doubt to his guilt that, in hindsight, [the reviewing court] cannot have confidence in the trial's outcome...." *Weeks v. Bowersox*, 119 F.3d 1342, 1354 (8th Cir. 1997) (quoting *Battle v. Delo*, 64 F.3d 347 (8th Cir. 1995)). A plea of actual innocence can also overcome AEDPA's one-year statute of limitations for filing habeas petitions. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

When Phelps filed his third motion for post-conviction relief in 2012, claiming that the alleged Backus diary would prove he was wrongfully convicted, he had only read about the diary in newspaper accounts of the Oldson trial. The Madison County District Court therefore had no difficulty in "find[ing] that it need not conduct an evidentiary hearing due to the absence of specific allegations regarding any factual details which would support the general conclusions regarding his acquittal" (Filing No. 19-4 at CM/ECF p. 91), and in denying post-conviction relief. The Nebraska Supreme Court likewise had no difficulty in affirming the district court's decision,

stating that "Phelps' allegations fall far short of the 'extraordinarily high' threshold showing of actual innocence which he would be required to make before a court could even consider whether his continued incarceration would give rise to a constitutional claim." *Phelps III*, 834 N.W.2d at 792.[2]

In John Oldson's appeal, however, the Nebraska Supreme Court was required to determine whether the Howard County District Court had erred in ruling that the alleged Backus diary was inadmissible because it was not properly authenticated. Because establishing the authenticity of the diary is crucial to the success of Phelps' gateway claim of actual innocence, the Nebraska Supreme Court's discussion will be set forth at length:

## II. BACKGROUND

\* \* \*

## 6. DEFENSE

\* \* \*

### (h) Sex Ranch Diary

The defense suggested that [Cathy] Beard had been with Jean Backus and Wetzel Backus after her disappearance and ultimately was murdered by Jean Backus. The Backuses owned 2,300 acres in Garfield County, Nebraska, near Ord.

The defense called the current sheriff for Valley County, who indicated that in March 2012, he came into contact with handwritten pages from a diary. The diary contained information regarding the

---

[2] The Nebraska Supreme Court viewed Phelps' third motion for post-conviction relief as asserting a freestanding claim of actual innocence. Such a claim would require more convincing proof than a gateway claim. *See Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1825 (2016).

possible death of a woman by the name of "Kathy" from Ord. The sheriff testified that the diary facially appeared to belong to Jean Backus, who was married at that time to Wetzel Backus.

The diary indicated that "Kathy's" death, as well as the death of three other women, had occurred on the Backus ranch. The sheriff testified that the other women listed in the diary were Sharon Bald Eagle, Karen Weeks, and Jill Dee Cutshall. All these women were known to have disappeared. Bald Eagle disappeared in 1984, and Weeks and Cutshall disappeared in 1987.

The sheriff testified the diary indicated that the Backuses had found Cutshall during a trip to Fremont, Nebraska, walking and without any clothes, and that the Backuses had found Bald Eagle in South Dakota. Bald Eagle had in fact disappeared from a reservation in South Dakota. Cutshall's clothes had been found in a forest.

The diary referred to "Kathy" as missing from Ord in 1989, and the sheriff affirmed that the diary indicated a "local man" was being blamed for "Kathy's" disappearance. Further, the diary indicated the author of the diary had run "Kathy" over with a pickup.

The sheriff testified that he had conducted an investigation into the diary. The sheriff explained that Jean Backus denied writing the diary and had granted law enforcement permission to search the ranch. Law enforcement conducted a thorough search and was unable to find any human remains or other suspicious evidence on the Backus property. The sheriff did not believe the diary to be valid.

\* \* \*

## IV. ANALYSIS

\* \* \*

## 6. ALLEGED BACKUS DIARY

... Oldson assigns as error the trial court's refusal to admit into evidence photocopies of a diary that Oldson claims was written by Jean Backus (hereinafter Backus).

### (a) Background

As previously described, the defense was able to adduce at trial testimony that a diary had been found and that the diary was purportedly authored by Backus. The defense was also able to adduce testimony detailing the events described in the diary, such as the abduction and sexual abuse of the missing women and the killing of "Kathy" from Ord. And the defense adduced evidence that the diary's description of the missing women was somewhat consistent with real events.

But the defense was unable to enter the diary pages themselves into evidence. After a separate hearing, the court had sustained the State's objection to the admission of the diary pages on the ground of lack of authenticity. The court explained that there was insufficient evidence to support a finding that the writing was what Oldson purported it to be.

### (i) Mailed From Unknown Address in Omaha

The parties had stipulated at the hearing that the purported diary pages were mailed from an unknown address in Omaha, Nebraska, to Oldson's home address while he was awaiting trial. The mailing envelope was handwritten in print and indicated it was from "Lonnie," with no return address. Inside were 54 pages of handwritten entries by an unnamed authorship, which appeared to have been torn from a bound diary, and are contained in the record pursuant to Oldson's offer of proof.

### (ii) Backus' Deposition

The defense submitted Backus' deposition testimony at the hearing. Backus was 88 years old at the time of her deposition. Backus testified that she never kept a diary or journal. She did not recognize the

-14-

leather diary cover or the diary pages presented to her. She did not recognize the handwriting of the inscription or the diary pages.

### (iii) Handwriting

Although defense counsel obtained several exemplars of Backus' handwriting during the deposition, no handwriting analysis was conducted. Nor did defense counsel argue at the hearing that a jury might find, pursuant to Neb. Rev. Stat. § 25-1220 (Reissue 2008),[3] that the diary was written in Backus' handwriting.

Facially, the handwriting on the envelope seems to match to a handwritten inscription on what was purportedly the inside of the diary's cover. Although it is not entirely clear from the record where the diary cover was found, the exhibit is a photograph of a leather-bound diary with numerous pages torn out. The inside of the cover has a handwritten inscription: "Merry Xmas, Jean," as well as Backus' address at the ranch.

### (iv) Douglas Olson

A person of some acquaintance with Backus, Douglas Olson (Douglas), was suspected by all parties of having mailed the diary pages to Oldson. Backus testified in her deposition that Douglas worked at a sale barn in O'Neill, Nebraska, where she sold her cattle. Sometimes, Douglas would work for her at the ranch hauling and vaccinating her cattle.

### (v) Testimony by Private Investigator

Defense counsel's private investigator testified at the hearing that Katie Bowers, Douglas' former live-in girlfriend, had found that Douglas possessed three boxes of information that appeared to pertain to Backus, including Backus' mail. Bowers had turned these items over to law enforcement, and a private investigator had gained access to them. In

---

[3] This statute provides: "Evidence respecting handwriting may be given by comparisons made, by experts or by the jury, with writing of the same person which is proved to be genuine." Neb. Rev. Stat. § 25-1220.

addition, Bowers had directly given the private investigator other writings that Douglas had sent her since she had turned over the boxes to law enforcement. Bowers worked at the veterinary clinic where Backus brought her animals. Bowers had a protection order against Douglas.

The private investigator testified that as of the time of the hearing, he had been unable to locate Douglas. Douglas' last known residences were a halfway house in Omaha and, prior to that, the Regional Center in Norfolk, Nebraska.

### (vi) Douglas' Other Writings

In support of the authenticity of the diary pages, the defense presented copies of several letters apparently either sent by Douglas to Bowers or found in the boxes of Backus-related items kept by Douglas in Bowers' house. These included several typed letters from an unnamed author to Bowers and sent in a handwritten envelope to her, in handwriting facially similar to that of the envelope in which the diary pages had been mailed to Oldson and similar to the diary cover inscription.

The letters themselves are largely incomprehensible. They seem to refer to a conspiracy, with the ultimate end of Backus' keeping the ranch and other parties' gaining money. The letters also refer to a man being held for several weeks, drugged, in Douglas' basement and Douglas' attempts to free him. There is no reference in these letters to a diary or to kidnapped women kept at the Backus ranch.

The private investigator also obtained a handwritten letter that was in the possession of the owners of the O'Neill sale barn where Douglas had worked. The letter, offered for purposes of the hearing, had been addressed to Douglas and had been sent to the sale barn. It purported to threaten Douglas and made reference to having "her diary," that "Jean will lose her ranch," and that Douglas should "[k]eep [his] mouth shut or [he] could wind up sleeping with the others."

-16-

Another letter sent to Bowers in 2011—in an envelope with writing similar to the one in which the diary pages were sent to Oldson—contained a handwritten note: "KATE THEY DONT KNOW I MADE COPIES." The note appears to be in the same distinctive handwriting as the mailing envelopes and the diary inscription. An attached map, in what appears to be the same handwriting, is written on the back of a 2010 correspondence to Backus from her optometrist. The map refers to a gun, Backus, and "BURN THIS WHEN DONE." A typed letter from "Marie" to "JORGE," and contained in the same envelope, referred to the directions on the map for the pickup point for a rifle. It also states, "This is between jean and kate for her dog...."

### (vii) Consistencies of Diary With Real Events

In addition to this supposed chain of custody evidence, defense counsel's argument for the authenticity of the diary pages as being authored by Backus was that the entries could be corroborated by real events. The defense pointed out the real kidnappings of Cutshall, Weeks, and Bald Eagle.

Defense counsel also pointed out that neighbors who were mentioned in the diary were Backus' actual neighbors. The diary also described cattle escaping and wandering onto the neighbors' property, and Backus confirmed in her deposition that sometimes that occurred. The diary indicated that Backus and Wetzel Backus preferred Hereford cows and that they had horses. Backus also confirmed those things to be true.

One diary entry states, "[F]riday we get to go to SD to look for our new guest we can have 3 guest[s] stay in there we have 3 sets of the shackles but can make more." Defense counsel pointed out that Backus admitted in her deposition that they had sometimes gone to South Dakota to buy bulls.

On September 18, 1989, the diary states that Wetzel, born in January 1910, had died. Defense counsel pointed out that these dates of Wetzel's birth and death are correct.

Thereafter, a diary entry states, "what to do with Kathy now," then describes that "Kathy" ran away and will not come back, and "I hit her with pickup will haul her to some place else as they R lookin for her." Defense counsel emphasized that the blunt trauma found on Beard's remains could be consistent with being struck by a vehicle.

### (b) Standard of Review

Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews the trial court's ruling on authentication for abuse of discretion.

An abuse of discretion, warranting reversal of a trial court's evidentiary decision on appeal, occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

### (c) Analysis

We find that the trial court did not abuse its discretion in determining that the purported Backus diary had not been properly authenticated. Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims. A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis. Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated; we review a trial court's ruling on authentication for abuse of discretion.

Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008), lists by way of illustration 10 means of adequately authenticating a document, none of which directly corresponds to the corroboration argument made by Oldson in this appeal. The most similar statutory illustration is rule 901(2)(d): "Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

-18-

Under such provision, other courts have found a writing to be adequately authenticated when, for instance, the writing was attributed to someone who was the only known resident of an isolated and remote area where the writings were found. Writings have also been adequately authenticated by virtue of the fact that they disclose information that is likely known only to the purported author.

But the circumstances of the diary pages' having been apparently in Douglas' possession and mailed by Douglas do not uniquely authenticate them as being written by Backus. Furthermore, none of the corroborated facts mentioned in the diary are the kind of facts that only Backus would know. The corroborated facts are either public record or facts Douglas could have discovered in his work at the ranch and at the sale barn.

These facts did not satisfy Oldson's burden to present evidence sufficient to support a finding that the diary was written by Backus. And they must be viewed in light of the fact that Backus denied writing the diary. In addition, there was no evidence that the diary pages were ever seen in Backus' possession or in a place where Backus solely had access.

Finally, it would have been natural for the trial court to have considered the elephant in the room: Why, despite being in possession of the alleged author's writing exemplars, obtained during Backus' deposition, did Oldson make no attempt to demonstrate or even argue that the diary pages were written in Backus' handwriting. We are troubled by the lack of discussion below of the handwriting of the diary, especially when it seems from our layperson's perspective that the handwriting on the envelopes—which the parties seem to assume was Douglas' handwriting—is much more similar to the handwriting of the diary than to any of Backus' handwriting exemplars.

While not a high hurdle, as Oldson points out, it is still the burden of the proponent of the evidence to provide the court with sufficient evidence that the writing is what it purports to be. And to establish on appeal that the trial court abused its discretion in finding that the evidence was not properly authenticated is a higher hurdle. An abuse of discretion occurs only when the decision is based upon reasons that are

-19-

untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. The trial court did not abuse its discretion in concluding that there was insufficient evidence that the diary was actually written by Backus. It did not abuse its discretion in concluding that the exhibit had not been authenticated to be Backus' diary.

*State v. Oldson*, 293 Neb. 718, 739-40, 789-95, __ N.W.2d __, 2016 WL 3344458 at **11-12, 36-39 (2016) (footnotes omitted).

The Nebraska Supreme Court was also required to determine whether Oldson was entitled to a new trial based on post-trial statements and testimony of Douglas Olson and DNA test results, which allegedly authenticated the diary. The Court ruled the district court did not abuse its discretion in denying the motion for new trial. This section of the Court's opinion in *Oldson* will also be set forth at length:

7. MOTION FOR NEW TRIAL

* * *

(b) Ground One: Douglas Found After Trial

*(i) Background*

Douglas was interviewed by defense counsel's private investigator and by law enforcement, and those interviews were entered into evidence in support of a motion for new trial. The defense also offered a recorded conversation between Douglas and his girlfriend while Douglas was in jail. Finally, the defense called Douglas to testify at the hearing.

a. Telephone Conversation With Girlfriend

In the telephone conversation with his girlfriend, Douglas stated that he cannot tell law enforcement what he knows or "they" will hurt his mother. Douglas said he knew Backus had a diary and knew where she buried it and why it did not burn in a fire on her property. He denied

-20-

writing the diary. Douglas later made reference to how "these people have told me everything what to write and what to do," but it does not seem from the context that he was referring to the diary.

### b. Interview With Private Investigator and Police

In the interviews with law enforcement and with defense counsel's private investigator, Douglas denied sending the diary pages or writing the diary. He was confronted with the fact that his DNA was found on the envelope the pages were mailed in. Douglas explained that he had envelopes and stamps in his backpack. Douglas speculated that when he was staying at a homeless shelter, the backpack was stolen.

In the interview with defense counsel's private investigator, Douglas made oblique references to Backus' having once told him she had had young girls living with her on the ranch in the past to help with washing and cooking. Douglas also talked about hauling scrap metal out of a wood shanty built into a hill. Douglas denied any knowledge of kidnappings at the ranch.

In the interview with law enforcement, Douglas referred to having just passed a mental evaluation in Norfolk. He explained that he had most recently been living at a homeless shelter in Omaha and spent most of his days at the library looking on the Internet at the local news.

Douglas explained that he previously worked odd jobs for Backus. Douglas said that Backus owed him money. Douglas described that, one day, three men who said they worked for Backus threatened Douglas and told him to forget he had ever seen them. Douglas thought that Backus and these men were "moving drugs." Douglas explained that sometime after that, he woke up in the hospital with no recollection of why he was there.

Law enforcement accused Douglas of writing the diary, indicating that it appeared to be Douglas' handwriting on the diary. Douglas did not specifically deny the handwriting was his. But Douglas claimed he had never seen the diary pages or the envelope in which they were mailed.

c. Douglas' Testimony at Hearing

In his testimony at the hearing on the motion for new trial, Douglas said he started doing odd jobs for Backus at the ranch in 2007. He testified that Backus stopped paying him. Douglas eventually again stopped working for Backus; Douglas testified that Backus owed him over $30,000 for work he had done for her. Douglas claimed some of what was owed him was eventually paid by a man named "Claire," last name unknown, who lived near Chambers, Nebraska. Douglas came into contact with "Claire" after "a guy that had worked for [Backus] before called me and told me, he said if you want to get paid to go see this Claire."

Douglas testified that he had seen Backus writing cattle prices and similar things in a journal that she carried with her when she went to the sale barns. He had never touched the journal, but had once seen it lying open and saw entries about her cattle.

Even though defense counsel submitted evidence that Douglas' DNA was found on the seal and the stamp of the envelope in which the diary pages had been mailed to Oldson, Douglas continued to deny having either written or mailed the diary. Douglas testified that he did not recognize the diary pages that defense counsel showed him at the hearing. Douglas also testified that he did not recognize the handwriting in the diary pages as Backus', although he stated that "[i]t's similar...."

Douglas stated that there were balloons in a spot on the ranch where Backus told him one of her cutting horses was buried. Douglas also reiterated that he had torn apart a structure built into a hill on the ranch and had found heavy chains in 50-gallon barrels that were inside the structure. He saw two bedframes in the structure. Douglas reiterated that Backus had told him that she once had girls living on the ranch who helped with the chores.

Douglas mentioned that one day, he opened a "wood shell box" that Backus carried around with her. In that box were "napkins and stuff" with writing on them, including several small books. He saw a reference to "Barbara" and how she had run away. Also, once when he proposed

digging on the ranch to place a water line, Backus "blew up right away and told me you ain't digging nothing on my land."

Douglas testified that he was scared of "[t]he guy in Grand Island that [Backus] had with her," an "Antonio Rodriguez," because Rodriguez had threatened Douglas several times. Douglas described a dog that became sick after eating "white powder" that looked like "drug stuff" in a box in the back of Backus' truck. Douglas said that Rodriguez made him take care of the dog and "keep [Douglas'] mouth shut," so that Backus would not get in trouble. Later, Douglas purportedly found a list of names that Backus and Rodriguez were "delivering stuff to." He said he was threatened to keep quiet.

### d. Defense Arguments at Hearing

At the hearing on the motion for new trial, defense counsel argued that DNA evidence confirming that the diary was in Douglas' possession somehow further authenticated the diary—apparently by providing a better chain of custody. Defense counsel also pointed out that Douglas did not know Oldson and had no motive for fabricating a diary and sending it to Oldson in order to exculpate him. Defense counsel's theory was that Douglas was trying to blackmail Backus with the diary. Defense counsel also pointed out that Douglas' testimony at the hearing provided information that corroborated other pieces of the diary, thus providing sufficient authentication of the diary as Backus' writing. The trial court denied the motion for new trial.

### (ii) Analysis

Oldson makes arguments on appeal similar to those made below. Oldson also makes new arguments about the authenticity of the diary that have little to do with finding Douglas. Oldson asserts for the first time on appeal that Backus was able to alter her handwriting for purposes of the deposition and asserts that Backus used similar shorthand abbreviations in the deposition exemplars as those in the diary. Oldson also argues that Backus' request to speak with counsel during the deposition, as well as Backus' evasive behavior during her deposition, such as "well-timed heart palpitations," "punctuate [Backus']

culpability." Oldson argues that the fact that Backus denied writing the diary should be given little weight, because it would be imprudent for Backus to admit to kidnapping and killing the women described.

We find no abuse of discretion in the trial court's determination to deny the motion for new trial based upon information gleaned after Douglas' arrest. A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.

Neb. Rev. Stat. § 29-2101 (Reissue 2008) provides that a new trial may be granted for any of the following grounds affecting materially the defendant's substantial rights: (1) irregularity in the proceedings which prevented the defendant from having a fair trial; (2) misconduct of the jury, the prosecuting attorney, or the witnesses for the state; (3) accident or surprise which ordinary prudence could not have guarded against; (4) the verdict is not sustained by sufficient evidence or is contrary to law; (5) newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at trial; (6) newly discovered exculpatory DNA or similar forensic testing evidence obtained under the DNA Testing Act; or (7) error at law occurring at trial.

We address whether a new trial was warranted on the ground that locating Douglas was newly discovered evidence material to Oldson's case. A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result. Evidence tendered in support of a motion for new trial on the ground of newly discovered evidence must be so potent that, by strengthening evidence already offered, a new trial would probably result in a different verdict.

Oldson apparently believes that Douglas' testimony would have, in conjunction with the other corroborating evidence, sufficiently authenticated the diary as a writing by Backus, thereby making it admissible. Oldson also apparently believes that the admission of the

-24-

diary into evidence at a trial would have probably produced a substantially different result. We disagree on both points.

We find no abuse of discretion in the trial court's conclusion that the additional evidence did not cure the foundational and reliability deficiencies that existed prior to finding Douglas. Douglas' arrest provided little more than the circular foundation of Douglas' own statements to support his assertion that he did not write the diary and his insinuations that Backus did. Oldson did not present at the hearing any independent evidence corroborating Douglas' testimony, including that Backus kept a diary, that Backus had a shanty built into a hill with beds and chains in it, that Douglas was an unwilling witness to Backus' apparent illegal drug operations, that Backus owed him a substantial amount of money, or that Rodriguez had threatened Douglas and possibly assaulted and kidnapped him.

Moreover, even if the court should or would have admitted the diary pages into evidence had it been presented with Douglas' statements during trial, Oldson failed to establish the probability that the jury would have reached a different result if the evidence had been admitted at trial. The jury had already been presented with the theory that Backus was the real killer. The jury had been told that there was a diary purportedly written by Backus in which she had described kidnapping and killing Beard and the other missing women.

The jury clearly rejected this theory, in spite of testimony that there was "corroborating evidence," such as the diary listing the correct names, dates, physical descriptions, and other correct details pertaining to the missing women named in the diary. It is unclear exactly how Oldson hypothesizes that presenting to the jury the photocopies of the actual diary pages or Douglas' testimony would have probably resulted in the jury's accepting the theory that Backus and Wetzel kept several kidnapped women as sex slaves and that Backus killed Beard by running her down with a truck.

We conclude that, as relates to the alleged Backus diary, the trial court did not abuse its discretion in denying Oldson's motion for new trial.

*Id.*, 293 Neb. at 796-802, 2016 WL 3344458 at **39-43 (footnotes omitted).

Phelps has presented no additional evidence to this court to authenticate the alleged Backus diary, nor has he presented any arguments that were not considered by the Nebraska Supreme Court in *Oldson*. For all of the reasons stated in the Nebraska Supreme Court's opinion, the court finds that the alleged Backus diary has not been properly authenticated.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the matter in question is what its proponent claims it is." Fed. R. Evid. 901(a). Rule 901 does not impose a high hurdle for authentication or identification. *See State v. Casterline*, 878 N.W.2d 38, 50 (Neb. 2016) (applying Nebraska rule comparable to federal rule). "To meet this standard, the proponent need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be." *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993) (citing *United States v. Long*, 857 F.2d 436, 442 (8th Cir.1988)). "A proponent of evidence may use circumstantial evidence to satisfy this standard." *United States v. Young*, 753 F.3d 757, 773 (8th Cir. 2014). "Once the proponent satisfies this burden, the jury determines any further questions as to the evidence's authenticity." *Id.*

"Proponents of evidence may authenticate an item through several methods including, '[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *Id.* (quoting Fed.R.Evid. 901(b)(4)). "It is well settled that genuineness of a writing can be established by circumstantial proof without resort to the handwriting or typewriting. Where the writings are such that only those persons acquainted with the particular transactions involved could have written them, the authenticity of the evidence is considered more reliable." *United States v. Helmel*, 769 F.2d 1306, 1312 (8th Cir. 1985) (quoting *United States v. Wilson*, 532 F.2d 641 (8th Cir. 1976)).

-26-

"*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). In this instance, however, when Phelps cannot even satisfy Rule 901's low bar for admissibility of the diary (*i.e.*, demonstrating a rational basis for concluding the document was authored by Jean Backus), there is no possibility of satisfying *Schlup*'s higher hurdle that the newly discovered evidence be "reliable."

Phelps first states that "[f]ingerprint and DNA analysis on the envelope and stamp in which the [photocopied] diary was mailed have established that Doug Olson, a ranch hand who worked for Jean Backus, handled the mailing envelope" (Filing No. 35 at CM/ECF p. 9). The court so finds. Phelps next states that "[o]ther information suggests that Olson stole the diary, along with other documents and letters from Jean Backus, as part of an ongoing dispute over her refusal to pay Olson for his work" (Filing No. 35 at CM/ECF p. 9). In support of this statement he cites Olson's testimony at the hearing on the motion for new trial (Filing No. 25-5 at CM/ECF pp. 36-49) and the testimony of Oldson's private investigator (Filing No. 25-3 at CM/ECF pp. 2-12). As the Nebraska Supreme Court noted, there is no independent evidence that Jean Backus kept a diary or owed Olson money.

Phelps contends that when Jean Backus was "asked to write out sentences during the deposition, she often used short-hand spelling similar to those contained in the diary" (Filing No. 35 at CM/ECF p. 11). The records reflects that Jean Backus was asked to write only three sentences (Filing No. 25-7 at CM/ECF pp. 64-70, 143), but similarities with the diary are not apparent. As observed by the Nebraska Supreme Court, Backus' handwriting also does not appear to match that of the diary.

Phelps says "[t]here is no doubt that Olson had access to Jean Backus' personal property" because Olson's ex-girlfriend, Katie Bowers, "explained at the motion for new trial proceedings that Olson had stored a number of boxes and papers belonging

-27-

to Jean Backus in her barn" and "[s]everal of the papers Bowers had turned over to law enforcement had Jean's address on the back of them" (Filing No. 35 at CM/ECF p. 10). The portion of the record cited by Phelps (Filing No. 25-3 at CM/ECF pp. 8-21; Filing No. 25-6 at CM/ECF pp. 9-27) actually involves trial testimony provided by Oldson's private investigator regarding Exhibits 232-242, as summarized in Sections IV.6(a)(*v*) and (*vi*) of the *Oldson* opinion. While Phelps claims that "[l]etters from Jean Backus found among these items suggest that Jean and her associates were trying to get a diary and/or some papers back from Olson" (Filing No. 35 at CM/ECF 10), the evidence does not support this claim.

Phelps also states that Olson, in phone calls from jail, told another girlfriend, Debra Jensen, "that he had found a diary that discussed the kidnaping and rape of numerous girls on the Backus ranch in the 1980s" (Filing No. 35 at CM/ECF  p. 9). Phelps cites a portion of the record where Oldson's Exhibits 294, 297, and 298 were received into evidence for purposes of the hearing on the motion for new trial (Filing No. 25-5 at CM/ECF , but those exhibits, which are identified in the index as compact discs, are not included in the record. The Nebraska Supreme Court indicates in Section IV.7(b)(*i*)a. of its *Oldson* opinion that Olson told his girlfriend "he knew Backus had a diary and knew where she buried it and why it did not burn in a fire on her property." Questioning by Oldson's attorney also indicates this was the substance of the phone conversation (Filing No. 25-5 at CM/ECF p. 25). Phelps also says Olson "stated he was afraid to speak to law enforcement out of fear of Jean's hired man" (Filing No. 35 at CM/ECF p. 9), but the cited portion of Olson's testimony (Filing No. 25-5 at CM/ECF pp. 15-17) makes it clear that he was referring to alleged drug dealing. (See Section IV.7(b)(*i*)c. of the *Oldson* opinion.)

Phelps argues that the contents of the alleged Backus diary are proof of its authenticity. He notes that "[a]n entry marking Wetzel Backus' death contains his specific date of birth–the type of detail that a wife would know and note" (Filing No. 35 at CM/ECF p. 10). It is also publicly available information. Phelps next states that "[t]he diary contains entries about neighbors, about the number of cattle on the ranch,

-28-

and about putting up hay and doing other chores without help," and "Olson verified that, while he was working with Jean on the ranch, he had discussions with Jean about these topics" and that "she often made notes about the number of cattle she saw as she was out with him doing chores" (Filing No. 35 at CM/ECF p. 10). Apart from the names of neighbors, the information is not otherwise corroborated. Phelps also relies on diary entries which name the girls or young women who allegedly were enslaved on the Backus ranch, give the dates they were abducted, and provide physical descriptions, but, again, this was all publicly available information.

With reference to Jill Cutshall, it is claimed that the following "details lend credibility to the notion that the young woman mentioned in the diary was taken by the Backus family, not David Phelps":

> Jill was 9 years old when she went missing on August 13, 1987. Her clothing was found at the Wood Duck Wildlife Preserve near Stanton, but her body was never found. The first diary entry mentioning Jill appears under a heading that is difficult to read, but could be either "August 84" or "August 87." It states: "left for fremnt nebr[.] found young girl walkn[.] no cloths[.]" (Filing #25-6 at 78; Filing #25-4 at 5; Orig. Tr. p. 1434) The communities of Stanton and Fremont are approximately one hour apart. Another entry relating to this girl states, "told us her name is Jill butt donot [sic] believe her." (Filing #25-4 at 2-3, Orig. Tr. p. 1431-1432; Filing #25-6 at 51) The "Jill" in the diary is described as having crooked teeth, and photos of Jill at the time of her disappearance show that she did have crooked teeth. (Filing #25-6 at 30 & 53)

(Filing No. 35 at CM/ECF p. 12).

In point of fact, these "details" are not inconsistent with Phelps' confession, in which Phelps stated that Kermit Baumgartner woke him on the morning of August 13, 1987, and said he had Jill Cutshall in his car, that Baumgartner drove Phelps and Cutshall to the Wood Duck area, that Baumgartner sexually assaulted Cutshall while Phelps held her, and that Phelps drove off after becoming nervous. Phelps said Jill

Cutshall was still alive when he left the scene. The alleged Backus diary does not indicate that Jill was abducted in Norfolk. The diary instead relates that the author happened upon a unclothed girl who was walking somewhere between Chambers (presumably) and Fremont.

Douglas Olson has been criminally charged with tampering with evidence in connection with John Oldson's murder trial. Whether it will be proved beyond a reasonable doubt that he faked the diary remains to be seen, but his authorship seems likely based on the available evidence. The diary's account was not accepted by the jury in Oldson's case. It is not likely that a jury weighing Phelps' guilt or innocence would find it credible, either.

In conclusion, a habeas petitioner who seeks to overcome the statute of limitations or procedural default by claiming actual innocence must support his allegations with "new reliable evidence" and must show that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." _Schlup_, 513 U.S. at 324, 329. The alleged Backus diary, while qualifying as newly discovered evidence, is not reliable and would not cause a reasonable juror to vote to acquit Phelps of the charge of kidnapping Jill Cutshall. Phelps' amended petition for a writ of habeas corpus therefore will be dismissed with prejudice.

### III. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set for in _Slack v. McDaniel_, 529 U.S. 473, 484-485 (2000). The court has applied the appropriate standard and determined Petitioner is not entitled to a certificate of appealability.

IT IS THEREFORE ORDERED:

1.    Petitioner's application for a writ of habeas corpus is denied, and this
      action is dismissed with prejudice.

2.    Judgment shall be entered by separate document.

3.    A certificate of appealability will not be issued.

DATED this 30th day of September, 2016.

                                    BY THE COURT:

                                    s/ *Richard G. Kopf*
                                    Senior United States District Judge

-31-